UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRONT RANGE EQUINE RESCUE
2185 NW 114th Loop
Ocala, FL 34475

       Plaintiff,

   v.

SALLY JEWELL
Secretary of United States Department of
The Interior,
1849 C Street, N.W.
Washington, DC 20240,
sued in her official capacity

NEIL KORNZE
Director, Bureau of Land Management
1849 C Street, N.W.
Washington, D.C 20240,
sued in his official capacity

JEFF ROSE
District Manager, Burns District Office
Bureau of Land Management
28910 Highway 20 West
Hines, OR 97738,
sued in his official capacity

       Defendants.

Civil Action No. _____

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1

1.     This case challenges a shocking decision by the agency responsible for caring for America's wild horses, to perform dangerous and untested surgical sterilization on captive wild horses – many of them pregnant mares.  This radical departure from the bounds of science and humane treatment is unauthorized, uncalled-for, and illegal.

2.     Despite its mandate to protect, manage and control wild horse populations in the United States, the Department of the Interior's (DOI) Bureau of Land Management's (BLM) Burns, Oregon District Office has determined instead to conduct untried, completely experimental sterilization surgeries on captive, formerly wild mares that BLM warehouses in Oregon in a corral with hundreds of other horses.

3.     Twice before the BLM has stated its intent to surgically sterilize wild horses, and both times it has withdrawn its proposal when challenged.  The current plan to conduct sterilization research experiments is equally unjustified, unsupported and unnecessary and will cause unacceptable harassment, harm and potentially the death of the very horses BLM is obligated to protect.

4.     BLM claims that its proposed Mare Sterilization Surgery -- given the euphemistic misnomer of "research" -- is necessary to develop alternative methods for the control of the wild horse populations.  BLM's decision to conduct these barbaric experiments on wild mares, however, is arbitrary and capricious and in violation of federal law, for a number of reasons.  The proposal is especially inappropriate because an alternative, nonsurgical, fertility control tool has already proven successful in managing wild horse populations in Oregon and elsewhere in the United States.

5.     Plaintiff Front Range Equine Rescue (FRER) seeks a declaration from this Court that BLM's decision to conduct the Mare Sterilization Surgery is arbitrary, capricious and should

be set aside as violating the Administrative Procedure Act ("APA"), 5 U.S.C § 702 and the Wild Free-Roaming Horses and Burros Act, 16 U.S.C § 1331 *et seq.*, and an injunction to prevent the BLM from moving forward with the Mare Sterilization Surgery.  Additionally, FRER seeks a declaration that BLM's failure to adequately consider the environmental impacts of the Mare Sterilization Surgery violates the National Environmental Policy Act, (NEPA), 42 U.S.C. § 4321 *et seq.*

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C § 702.

7.      Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e).  This civil action is brought against an agency of the United States and an officer of the United States acting in her official capacity, and Defendants maintain offices in the District of Columbia.  28 U.S.C. § 1391(e).  An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. § 2201, *et seq.*  This Court may review Defendants' actions and order appropriate relief under both the APA and NEPA.

## PARTIES

8.      Plaintiff FRER is a 501(c)(3) nonprofit organization incorporated in Colorado. Established in 1997, FRER is dedicated to stopping cruelty and abuse of horses through rescue and rehabilitation.  FRER is actively involved in the rescue, rehabilitation and adoption to good homes of domestic and wild horses, and in educational efforts regarding responsible horse ownership and wild horse roundups.  FRER has assisted thousands of horses through its rescue and educational programs.

3

9.     For almost twenty years, one of FRER's primary goals has been to protect wild horses on federal public lands as well as those horses captured and removed from the federal lands and sent to long-term holding corrals or transferred from the Bureau of Land Management ("BLM") to third parties.  To that end, FRER has expended significant time and resources investigating, monitoring, and reporting to its supporters on the BLM's actions with respect to wild horses.

10.     FRER has been diverting its limited resources to investigate, evaluate, monitor and assess the BLM's Mare Sterilization Surgery challenged by this action.  It has used its resources that it would have used for other programs, but for the BLM's illegal actions in preparing to engage in the Mare Sterilization Surgery.  Because of the Mare Sterilization Surgery, FRER has had to focus its attention on the BLM's illegal actions and its plans to begin this uncharted surgical experimentation.

11.     FRER will continue to monitor, evaluate and provide comments on BLM's conduct with respect to its sterilization program, and will continue to provide reports to its supporters about that conduct.  These actions will continue to divert FRER's limited resources from FRER's other programs.

12.     FRER has also repeatedly prepared comments on unjustified or harmful roundups conducted by the BLM, and other inhumane practices – like the Mare Sterilization Surgery -- by the BLM.  FRER's comments urge BLM and other responsible federal agencies to comply with federal law and to ensure that removals and any other federal actions taken with regard to wild horses are based on a legitimate need to undertake those actions, supported by and not in violation of applicable laws, and that the horses' safety and welfare, including the herds' ability

to maintain sufficient genetic diversity and viability, will be assured during and after those actions.

13.     FRER has diverted, and continues to divert time, money, and efforts away from its other work in order to evaluate, research, investigate, and combat BLM's illegal conduct affecting wild horses, and it has specifically done so with respect to BLM's Mare Sterilization Surgery.

14.     Because of BLM policies harming the health of wild horses across the country, FRER has been and continues to be forced to expend its limited resources investigating and tracking BLM's unlawful actions. The resources that have been used for these projects would otherwise have been used for FRER's other campaigns and organizational goals, including its efforts to keep wild horses free from roundups and confinement in BLM long-term holding areas, adoption of rescued or removed wild horses to good homes, and educational efforts regarding wild horse roundups, the cruelty of horse slaughter, and responsible horse ownership.

15.     FRER is uniquely poised to challenge Defendants' Mare Sterilization Surgery because of its particular focus on horses who are abandoned, rescued, or debilitated. The challenged action will stimulate greater abandonment of wild horses, which will further increase the burden on FRER to rescue those horses, if they end up in auction or being sold by the BLM. And the Mare Sterilization Surgery program, if it begins, will specifically impact FRER's programmatic work and its organizational goals.

16.     Defendants' actions challenged here impede FRER's actions and frustrate its ability to pursue its goals for several reasons. For instance, the planned sterilization procedures promote and further inhumane treatment of wild horses, which requires FRER to divert its limited organizational and programmatic resources to continue to monitor these activities.

These resources would otherwise be spent on programmatic rescue and educational activities to protect wild and domestic horses, in furtherance of FRER's goals.

17.     There is a direct conflict between the Defendants' conduct – the inhumane, unnecessary, untested surgical sterilization of wild horses – and FRER's mission of protecting wild horses, both on the range and after they have left the range.

18.     Defendants' actions will also cause FRER to divert its programmatic and organizational resources to prevent an expansion of the Mare Sterilization Surgery, which BLM has already indicated it intends to pursue.  FRER will be forced to expend additional resources investigating, evaluating, and educating the public about the BLM's planned activities, which are both illegal and inhumane.  Since these resources would otherwise be spent on rescue, rehabilitation, and education, Defendants' unlawful conduct directly impedes Plaintiff's activities, and causes a significant drain on its resources and time.

19.     The Burns District Office, BLM, and the Department of the Interior have inflicted and will continue to inflict economic injury on FRER, through a series of ongoing policies enacted and actions planned to be taken by BLM involving unacceptable, illegal, and inhumane surgical sterilization of mares in a manner that violates federal law and irresponsibly deals with wild horses.

20.     Defendants' actions have directly caused and perceptibly impaired FRER's ability to provide its supporters, the public, and other horses with assistance and education that FRER otherwise would have been able to provide were it not for Defendants' actions alleged here. Defendants' conduct has caused concrete and demonstrable injury to FRER's activities, and a consequent drain on its resources.

21.    FRER's injuries will be redressed if Plaintiff prevails in this action, because if the Mare Sterilization Surgery is stopped, FRER will not need to continue to monitor the surgical sterilization of wild horses, will not need to consult with experts with respect to the viability and safety of such a program, and will not need to dedicate its resources towards educating the public about this program.

22.    Defendant Sally Jewell is the Secretary of the Department of the Interior, the parent agency for the BLM, and is ultimately responsible for the Mare Sterilization Surgery. She is sued in her official capacity.

23.    Defendant Neil Kornze is the Director of the BLM, and therefore also responsible for the Mare Sterilization Surgery. The BLM is an agency within the United States Department of the Interior. The BLM is responsible for the protection and management of wild horses under the Wild Free-Roaming Horses and Burros Act of 1971 (Wild Horse Act), 16 U.S.C § 1331 *et seq.* The Wild Horse Act authorizes BLM to maintain ranges on public lands as sanctuaries for the protection and preservation of wild horses and burros. 16 U.S.C. § 1333. He is sued in his official capacity.

24.    Defendant Jeff Rose is the District Manager for the Burns, Oregon District Office of the BLM. In Oregon, BLM is charged with managing the public lands and resources of the Burns Field Office, and in managing the Mare Sterilization Surgery, in accordance and compliance with federal laws and regulations. He is sued in his official capacity.

## LEGAL FRAMEWORK

### *ADMINISTRATIVE PROCEDURE ACT (APA)*

25.    The APA provides for judicial review of final agency action for persons adversely affected or aggrieved by the agency action. 5 U.S.C § 702.

26.     The APA authorizes this reviewing Court to "hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right; [or] without observance of procedure required by law." 5

U.S.C. §§ 706(2)(A), (C), and (D).

27.     If a federal agency such as BLM implements new policy which deviates from the

status quo, the new policy is deemed arbitrary or capricious unless the agency displays

awareness that it has changed its policy and provides a reasoned explanation for why it believes

the new policy is better than its previous position. *See FCC v. Fox Television Stations, Inc.*, 556

U.S. 502, 515 (2009).

## NATIONAL ENVIRONMENTAL POLICY ACT

28.     NEPA requires federal agencies to conduct environmental impact analyses for

regulatory actions.

29.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R.

§ 1500.1(a).  NEPA's purposes encompass "[promoting] efforts which will prevent or eliminate

damage to the environment and biosphere and stimulate the health and welfare of man" and

"[establishing] a Council on Environmental Quality" ("CEQ") charged with "formulat[ing] and

recommend[ing] national policies to promote the improvement of the quality of the

environment." 42 U.S.C. §§ 4321, 4342.

30.     In enacting NEPA, Congress "recogniz[ed] the profound impact of man's activity

on the interrelations of all components of the natural environment, particularly the profound

influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances[.]" 42 U.S.C. § 4331.

31.     The goals of NEPA reflect "the continuing policy of the Federal Government . . . and other concerned public and private organizations, to use all practicable means and measures . . . in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." *Id.*

32.     The Council on Environmental Quality ("CEQ") established by NEPA is charged with "formulat[ing] and recommend[ing] national policies to promote the improvement of the quality of the environment." 42 U.S.C. § 4342.

33.     The USDA has expressly "incorporate[d] and adopt[ed]" all of the CEQ regulations. 7 C.F.R. § 1b.1(a).

34.     The CEQ regulations implementing NEPA mandate that "[f]ederal agencies shall to the fullest extent possible . . . [u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects . . . upon the quality of the human environment," and "[u]se all practicable means . . . to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." 40 C.F.R. §§ 1500.2(a), (f).

35.     NEPA requires all federal agencies to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).  This statement is referred to as the Environmental Impact Statement ("EIS").

36.     CEQ has issued regulations defining the term "major federal action."  In particular, 40 C.F.R. § 1508.18 provides that:

> 'Major Federal action' includes actions with effects that may be
> major and which are potentially subject to Federal control and
> responsibility . . . (a) Actions include new and continuing
> activities, including projects and programs entirely or partly
> financed, assisted, conducted, regulated, or approved by federal
> agencies; new or revised agency rules, regulations, plans, policies,
> or procedures; and legislative proposals. . . .

40 C.F.R. § 1508.18.

37.     CEQ regulations explain that evaluation of the term "significantly" in 42 U.S.C.

§ 4332(C) requires considerations of both "context" and "intensity". 40 C.F.R. § 1508.27. For

context, the agency must consider the effects on society as a whole, the affected region, the

affected interests, and the locality. 40 C.F.R. § 1508.27(a). For intensity, meaning the severity

of the environmental impact, the agency must take into account multiple considerations, among

them: the degree to which the proposed action affects public health or safety; the degree to which

the effects on the environment are likely to be highly controversial; the "degree to which the

possible effects on the human environment are highly uncertain or involve unique or unknown

risks"; the degree to which the action may establish a precedent for future actions with

significant effects; and "[w]hether the action threatens a violation of Federal, State, or local law

or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b).

38.     "Effect" is defined in CEQ regulations to encompass both direct and indirect

effects and impacts, including but not limited to ecological, aesthetic, historic, cultural,

economic, social, or health effects, whether direct, indirect, or cumulative. 40 C.F.R. § 1508.8.

39.     Where an agency is invoking a new procedure or program, NEPA review is

required before that program can be invoked. "NEPA procedures must insure that environmental

information is available to public officials and citizens before decisions are made and before

actions are taken." 40 C.F.R. § 1500.1(b).

40.     "Approval of a resource management plan is considered a major Federal action

significantly affecting the quality of the human environment." 43 C.F.R. § 1601.0-6.  Therefore,

BLM is required to prepare an EIS to assess the effects of the Mare Sterilization Surgery.

41.     One common category of federal action is "[a]pproval of specific projects, such as

construction or management activities located in a defined geographic area.  Projects include

actions approved by permit or other regulatory decision as well as federal and federally assisted

activities." 40 C.F.R. § 1508.18(b)(4).

42.     The EIS must describe: (i) the environmental impact of the Mare Sterilization

Surgery, (ii) any adverse environmental effects which cannot be avoided should the Mare

Sterilization Surgery be implemented, (iii) alternatives to the Mare Sterilization Surgery, (iv) the

relationship between local short-term uses of man's environment and the maintenance and

enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments

of resources which would be involved in the Mare Sterilization Surgery should it be

implemented.  42 U.S.C. § 4332(C).


## WILD FREE-ROAMING HORSES AND BURROS ACT

43.     In 1971, Congress declared that "wild free-roaming horses and burros are living

symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life

forms within the Nation and enrich the lives of the American people; and that these horses and

burros are fast disappearing from the American scene." 16 U.S.C. §§ 1331 *et seq.*  The Wild

Horse Act further provides, *inter alia*, that viable herds of wild horses should remain on the lands

on which they were found at the time the Wild Horse Act was passed, "as an integral part of the

natural system of the public lands." *Id.* That is, barring compelling reasons to the contrary, wild

horses are entitled to stay in their "herd area"—the "geographic area identified as having been used by a herd as its habitat in 1971." 43 C.F.R. § 4700.0-5(d).

44.     Congress delegated to the Secretary of Agriculture and the Secretary of the Interior jurisdiction over all wild free-roaming horses and burros "for the purpose of management and protection." *Id.* § 1333(a).

45.     Congress requires the agencies involved to preserve and safeguard the horses in a manner that causes the horses the least amount of interference.  The Wild Horse Act provides that "[a]ll management activities shall be at the minimal feasible level ... in order to protect the natural ecological balance of all wildlife species which inhabit such lands, particularly endangered wildlife species." *Id.*  BLM's own regulations mirror and amplify the statutory requirement that it engage in the least amount of interference with the horses that is necessary. The regulations mandate that management of the horses *shall* "be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. § 4710.4.

46.     Section 1333(b)(1) requires the BLM to maintain a current inventory of wild horses and burros so that it can

> make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels of wild free-roaming horses and burros on these areas of public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels).

*Id.* § 1333(b)(1).

47.     If BLM determines, based on reliable information, that there is an "overpopulation" of wild horses on public land, and only if the removal of "excess" animals is *necessary*, the BLM is entitled to remove them. *Id.* § 1332(b)(2).  The agency can only take

animals out of the herd who "*must* be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id.* § 1332(f) (emphasis added).

48.    While "sterilization" is an option for the BLM under the Wild Horses Act, the BLM's current program of sterilization is not contemplated by the Act, because the nature of the Mare Sterilization Surgery is insupportable, is not the minimum feasible alternative, is inhumane, threatens the health and safety of the horses who are the BLM's wards, and is arbitrary and capricious as a sterilization option.

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS

### *The Mare Sterilization Surgery "Research" Project*

49.    In the Wild Horse Act, Congress charged BLM with the "protection, management, and control of wild free-roaming horses and burros on public lands." P.L. 92-195 (Dec. 15, 1971); *see also* 16 U.S.C. § 1331 ("wild free-roaming horses and burros . . . are to be considered in the area where presently found, as an integral part of the natural system of the public lands").

50.    When the Wild Horse Act was passed, wild horses and burros were free-roaming on approximately 53.8 million acres of land.[1]  Today, the land available to these animals has been reduced to approximately 31.6 million acres.[2]  That reduction in their habitat range is a direct result of BLM's process of "management," which has removed nearly half of the wild horses' and burros' habitat.

---

[1] BLM, Wild Horse and Burro Quick Facts (Dec. 11, 2014), *see* http://www.blm.gov/wo/st/en/prog/whbprogram/history_and_facts/quick_facts.html.

[2] *Id.*

51.    BLM acts as the protector, on behalf of the American people, of wild horses, and must ensure that the actions it takes to manage wild horses actually benefit those animals, rather than benefitting only BLM or private interests.  Moreover, BLM is required to fulfill this Congressional mandate at the "minimal feasible level."  16 U.S.C. § 1333.  Above all, BLM's actions must be consistent with the authority and purpose of the Wild Horse Act.  Congress explicitly expressed that BLM shall protect wild horses "from capture, branding, harassment or death."  *Id.*  This legislative intent illustrates that preservation of the *natural* state of the herds and the individual animals and ensuring that the horses are not subject to harassment or other unnecessary devices are the core responsibilities of BLM under the Wild Horse Act.

52.    On January 5, 2016, the BLM released the Mare Sterilization Research Preliminary Environmental Assessment DOI-BLM-OR-B000-2015-0055-EA.

53.    The BLM received comments from members of the public, including FRER, with strong opposition to the Mare Sterilization Research project.

54.    On May 23, 2016, the BLM released the Mare Sterilization Research Environmental Assessment (EA) DOI-BLM-OR-B000-2015-0055-EA.

55.    As set forth in the EA, BLM proposes to immediately begin "research" to investigate the safety and effectiveness of three separate methods of surgical sterilization of approximately *two-hundred and twenty-five* formerly wild horse mares.  These mares are currently segregated in long-term holding pens.  The EA will assess the following methods of mare sterilization:

- *Ovariectomy via colpotomy* (ovariectomy) – removal of both ovaries in a surgical procedure that is at best risky when performed on individual mares in sterile, stable settings under the care of a veterinarian, and untested and dangerous in a setting such as the long-term holding facilities set up for captured wild horses;

- *Surgically untested research utilizing endoscopic tubal ligation* (tubal ligation) – which involves the cauterization and then the slicing of the oviduct; and

- *Untested and unpredictable hysteroscopically-guided laser ablation of oviduct papilla* – which will use a laser to scar and then hopefully seal the opening of each oviduct.

56.    Each of these procedures is impermissibly dangerous and inhumane when applied to wild horses held in long-term warehousing situations.

57.    Ovariectomy is a procedure that has been performed, but is recommended by most scientists and veterinarians for *domesticated* horses and then only as part of a laparoscopic-assisted procedure, in which the veterinarian can visualize the ovaries and other organs and structures within the vicinity of the ovaries.

58.    The BLM and its researchers are *not* planning laparoscopic procedure, but a blind cutting of organs that will only be palpated, and that the researchers will hope are ovaries, and not some other structures that should not be cut.

59.    This procedure will be performed on pregnant mares in "various gestational stages."

60.    BLM's intention to engage in the blind excision of mares' ovaries, with the hope that they get it right, is dangerous, inhumane, potentially fatal, and arbitrary and capricious. Indeed, BLM admits that if ovariectomy is performed to sterilize wild horse mares, "there could

be an increase in surgical complications compared to those observed in domestic mares." EA at 5.

61.    BLM admits that the potential complications – which range from excessive internal bleeding to infections to death – remain unknown. "BLM has determined that because the surgical complications of performing this technique on wild horse mares at various gestational stages have not been well documented, research investigating potential complications as a function of gestational stage should be performed and compared to other methods of surgical sterilization before this technique is made operational." EA at 5.

62.    BLM's willingness to perform "research" on pregnant mares who remain wild, though captive in holding corrals, is a blatant violation of its obligations to these horses and a violation of federal law. Rather than "living symbols" roaming free, these wild horses will instead become living *specimens* upon which unknown results – including painful and lethal complications – could be the ultimate consequences. BLM has endorsed and agreed to fund this experimentation.

63.    BLM's tubal ligation procedure is, by any measure, merely "hypothesized" because, as BLM indicates in the EA, this is an idea that has never been tried before. BLM's only support of this procedure – never before performed on horses – is that an analogous surgical procedure is done regularly for women – in controlled settings, under general anesthesia, in the confines of the sanitary and aseptic surgical conditions found in hospitals. But nowhere does the BLM explain why the success of tubal ligation on humans under the care of trained surgeons – and undoubtedly after years of research on cadavers before the procedures were approved -- should translate to approval without inquiry of a procedure on horses. Not only is equine anatomy and physiology obviously and notably different than that of humans, the difference in

the support and protections provided to humans in hospitals, versus horses in a long-term holding corral (or, at some point, possibly on the open range), makes the human comparison complete folly.

64.     BLM's third procedure proposed in the EA, hysteroscopically-guided laser ablation, "*is new; there are no known studies using this technique to permanently sterilize wild or domestic mares.*" EA at 29 (emphasis added).  Despite the absence of any information regarding this procedure, BLM's approach is to move forward and do its experiments on living subjects who could suffer horribly in the process.  With the procedure never done before, the list of potential complications is essentially endless.

65.     The BLM acknowledges this procedure would "*always* cause abortions if used on pregnant mares," EA at 52 (emphasis added).

66.     The procedure will be performed on up to 50 mares who are not pregnant.  EA at 27.

67.     The decision to engage in what can hardly be called "research" is counterintuitive, dangerous, and unscientific.  It violates all principles of caution, care and protection that BLM owes the horses, and ignores or accepts the myriad potential untoward and harmful results.  These problems are only exacerbated by the fact that BLM is planning these procedures on wild mares in long-term holding corrals.

68.     A humane and scientifically-proven alternative -- the administration of the use of Porcine Zona Pellucida (PZP) —is already used by, and available to, the BLM.  In contrast to the experimental procedures outlined in the EA, PZP contraceptive's application to wild horses *has* been thoroughly studied and proven effective in managing population growth and ensures wild horses' ability to remain in their habitat.  BLM does not dispute that PZP is effective

contraception for wild mares.  Rather, its chief complaint against PZP appears to be that PZP is simply inconvenient for the BLM because PZP must be regularly re-administered.  EA at 10.

69.     The BLM has planned, and then withdrawn, surgical sterilization for wild horses in the past.  In 2011, BLM withdrew its plans to castrate Wyoming wild horses when they were challenged.  The court, in dismissing the case, recognized that the sterilization procedures planned in that case – just like those now promoted -- are of an "extreme and irreversible nature." *Am. Wild Horse Preservation Campaign v. Salazar*, 800 F. Supp. 2d 270, 272-73 (D.D.C. 2011).  Facing a potential preliminary injunction against its castration plans, BLM notified the court that its decision to castrate the males had been abandoned, and instead, BLM would pursue fertility control treatment of the mares with the PZP vaccine.  *Id.*

70.     In 2012, again facing challenge to a surgical sterilization program, the BLM abandoned its efforts to castrate Nevada's wild horses.  Nevertheless, with the challenged action here, BLM is attempting another illegal method to begin mass sterilization of America's wild horses.

71.     Defendants concede that they have neither prepared an EIS nor complied with NEPA.  EA at 6.  Moreover, Defendants recognize that they have not performed any detailed analysis of the following:

- The side effects of these sterilization procedures;

- The social and behavioral effect on the sterilized mares if they are returned to the herd; or,

- The Mare Sterilization Surgery's effect on the genetic viability of wild horse herds;

EA at 9-12.

### *Estimated Costs of Mare Sterilization Surgery*

72.     Defendants estimate that the cost of simply holding the 225 mares for the 12 months needed to conduct the Mare Sterilization Surgery will be $410,625.  EA at 53. Additionally, Defendants estimate that additional costs for each procedure will be $250-$300 for the ovariectomy, $150-$200 for tubal ligation and $75-$125 for hysteroscopically-guided laser ablation.  EA at 52.  These are estimated costs *per each mare* and may not even include other required procedures such as performing ultrasound on the mares and additional testing.  *Id.*  Of course, these costs will be incurred in addition to the current cost of managing wild horses and therefore cannot be within the "minimum feasible level" required for Defendants' management activities.

73.     If the Mare Sterilization Surgery project is set aside, there will be no increased cost to Defendants because they will be continue to operate under those existing policies and programs that have previously been approved and funded.  The fact that these current policies *might* lead to future decisions by BLM with respect to wild horse herds is not a sufficient basis for conducting untested surgical procedures on living wild horse mares.  No other alternative plan, such as the use of animal cadavers for this research, is contemplated in the EA.

74.     Moreover, the EA does not demonstrate any basis for concluding that these experimental procedures performed on mares confined to long-range holding facilities sufficiently replicates conditions of actual wild horses.  If in fact the Mare Sterilization Surgery procedures are not feasible for free-roaming herds, the pain and suffering of those horses used in the Mare Sterilization Surgery will have served no legitimate purpose and the costs expended on the Mare Sterilization Surgery will no longer be available to use for other current management activities.

*The Existing Policy:  PZP*

75.    Defendants concede that "the use of PZP for fertility control is well documented" and it "could be useful in some scenarios." EA at 10.

76.    PZP *has* been proven effective, has very few dangers, and does not threaten the lives of the horses or subject them to unnecessary surgery

77.    The only rationale stated for not continuing the use of PZP is that "access to animals for timely inoculation and other management restraints *may* affect the utility of PZP as a management tool." EA at 10 (emphasis added).

78.    Defendants further concede that the only negative impact setting aside the Mare Sterilization Surgery would have on Defendants is that "it would not be possible to conduct the research specified in the financial assistance agreements." EA at 12.  The fact that Defendants proceeded unlawfully and now must "de-obligate" funding for the agreements is not a sufficient basis for proceeding with the dangerous and irreversible procedures contemplated in the Mare Sterilization Surgery.

## CLAIMS FOR RELIEF

## COUNT ONE

(Violation of the Administrative Procedure Act)

79.    Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

80.    By authorizing the Mare Sterilization Program, Defendants have abused their discretion and acted arbitrarily and capriciously and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C), and (D).

81.     Defendants' conduct is the legal and factual cause of Plaintiff's injuries alleged in this Complaint.

82.     Because Defendants' proposed Mare Sterilization Surgery violates the language and the spirit of governing law in an arbitrary and capricious manner, Defendants have violated their duties under the APA.  Accordingly, the Mare Sterilization Surgery should be declared unlawful and be set aside.

## COUNT TWO

(Violation of the Wild Free-Roaming Horses and Burros Act)

83.     Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

84.     Defendants' determination to pursue the Mare Sterilization Surgery is unnecessary given the availability of an effective, safer, reversible alternative in PZP and therefore violates the Wild Horse Act's requirement that Defendants' management activities "shall be set at the minimum feasible level."

85.     Defendants' decision to implement the inhumane procedures of the Mare Sterilization Surgery violates their duties under the Wild Horses Act.

86.     Because the Mare Sterilization Surgery will result in highly invasive and irreversible sterilization, it is by definition not the "minimum feasible level" of care for wild horses.

87.     Defendants' determination to pursue the Mare Sterilization Surgery additionally violates the Wild Horse Act's requirement that "free roaming horses . . . shall be protected from capture and harassment" and Defendants' own requirement that these wild horses be managed in "self-sustaining populations of healthy animals."

88.     In implementing its decision to conduct the Mare Sterilization Surgery, the BLM has determined that it prefers surgical sterilization over existing population controls such as PZP, because it will make it easier for it to manage the wild horse population.

89.     BLM has violated the Administrative Procedure Act and the Wild Horse Act because it has failed to consider alternatives and the lasting and dangerous impacts of the Mare Sterilization Surgery.

90.     Each and every one of these actions and omissions have injured and damaged FRER as set forth above.

91.     Because Defendants' proposed Mare Sterilization Surgery violates the language and the spirit of governing law in an arbitrary and capricious manner, Defendants have violated their duties under the Wild Horse Act.  Accordingly, the Mare Sterilization Surgery should be declared unlawful and be set aside.

## COUNT THREE

(Violation of the National Environmental Policy Act (NEPA))

92.     Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

93.     By authorizing the Mare Sterilization Surgery without first conducting an environmental review and producing an EIS according to NEPA, 42 U.S.C. § 4332(C) *et seq.*, USDA has violated NEPA and CEQ's implementing regulations, and has acted arbitrarily and capriciously, and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2) *et seq.*

94.     By failing to adequately consider the environmental impacts of the Mare Sterilization Surgery on human environment, and by failing to consider the relevant CEQ factors, Defendants have failed to take the "hard look" at the impacts of its chosen action as required by

NEPA. Accordingly, Defendants' actions and omissions have violated their obligations under NEPA.

95.     Defendants arbitrarily contend that the Mare Sterilization Surgery is not subject to full NEPA compliance because it is only a "proof of concept approach." EA at 6. There is no basis for Defendants' conclusion and Defendants' decision to proceed with the Mare Sterilization Surgery before preparing an EIS violates both NEPA and CEQ's regulations as set forth above.

96.     Each and every one of these actions and omissions have injured and damaged FRER as set forth above.

97.     The Mare Sterilization Surgery should be declared unlawful and be set aside.


## RELIEF REQUESTED

Wherefore, FRER respectfully requests that this Honorable Court:

A.     Declare that Defendants have violated the Wild Free-Roaming Horses and Burros Act by authorizing the Mare Sterilization Research;

B.     Declare that Defendants have violated the Administrative Procedure Act by authorizing the Mare Sterilization Research;

C.     Declare that Defendants have violated the National Environmental Policy Act by authorizing the Mare Sterilization Research;

D.     Enjoin Defendants from carrying out any aspect of the proposed Mare Sterilization Research;

E.     Vacate the Mare Sterilization Research project and any administrative agency decision that authorized the project;

F.     Award Plaintiff its costs and reasonable attorney's fees; and,

//

G.    Award Plaintiff any other relief that is just and proper.


Respectfully submitted this 25 day of July, 2016

SCHIFF HARDIN LLP

*Elizabeth R. Geise*
Elizabeth R. Geise, D.C. Bar No.358266
EGeise@schiffhardin.com
901 K Street N.W.
Washington, D.C. 20001
Telephone:  (202) 778-6400

SCHIFF HARDIN LLP
Bruce A. Wagman, CA Bar No. 159987
(Will seek admission *Pro Hac Vice*)
BWagman@schiffhardin.com
One Market, Spear Tower, 32nd Floor
San Francisco, CA 94105

Attorneys for Plaintiff
FRONT RANGE EQUINE RESCUE

24